# DARIN R. DOCKTER ET AL. *v.* KENNETH D. SLOWIK
## (AC 25050)

Lavery, C. J., and Schaller and Dranginis, Js.

Argued May 31—officially released September 20, 2005

*James V. Somers*, with whom, on the brief, were *Gregory Shettle, Brian Q. Gedicks* and *Regen O'Malley*, for the appellant (defendant).

*John C. Heffernan*, for the appellee (plaintiff).

*Opinion*

DRANGINIS, J. The primary issue presented in this appeal is whether the trial court properly exercised its equitable power to rescind a contract for the purchase of real property and to order restitution. On appeal, the defendant, Kenneth D. Slowik, claims that the court improperly rendered judgment in favor of the plaintiffs, Darin R. Dockter and Mia L. Dockter, because (1) there was no evidence that the plaintiffs actually, reasonably relied on his alleged misrepresentation when they entered into the contract for the purchase of the property, (2) the plaintiffs did not elect promptly the equitable remedy of rescission and (3) the court admitted expert testimony of a witness who had not been disclosed as an expert. We affirm the judgment of the trial court.

The following facts are relevant to our resolution of the defendant's appeal. In January, 2003, the plaintiffs filed an application for a prejudgment remedy against the defendant. The complaint attached to the application alleged that on or about July 1, 2002, the plaintiffs entered into a contract to purchase residential property at 29 Jacobson Farm Road in East Hampton from the defendant. It also alleged that to induce the plaintiffs to purchase the property, the defendant represented to them that the quantity and quality of the water supply was adequate. The complaint further alleged that the

quantity of the water supply was not adequate, that the defendant's representations to the contrary were known by the defendant to be false and were made with the intention of inducing the plaintiffs to purchase the property, and that the plaintiffs relied on the defendant's representations. The plaintiffs paid a price far in excess of the value of the property, and expended sums in an effort to correct the problem of an inadequate water supply and to secure alternate living arrangements. The prayer for relief alleged damages, exemplary damages, attorney's fees and such other relief as the court deemed fair and proper.

The parties presented evidence in September, 2003, and thereafter submitted briefs to the court, which heard arguments of counsel on December 18, 2003. The court rendered its judgment on January 7, 2004. The court found the following facts. The plaintiffs purchased the property from the defendant on August 29, 2002. Attached to the July 1, 2002 contract of sale was a residential property disclosure report, required by General Statutes § 20-327b,[1] which the defendant had completed. The defendant answered "no" to item ten, "Drinking water problems? Quality or quantity? Explain." The defendant testified that he answered no to the question because, at the time he completed the report, there were no problems with the water and he did not know that he should have included information concerning past problems that were resolved by replacing the pump in 1995 and hydrofracting[2] the well in 2001.

[1] General Statutes § 20-327b (a) provides in relevant part: "Except as otherwise provided in this section, each person who offers residential property in the state for sale, exchange or for lease with option to buy, shall provide a written residential condition report to the prospective purchaser at any time prior to the prospective purchaser's execution of any binder, contract to purchase, option, or lease containing a purchase option. . . ."

[2] Hydrofracting is the process of putting pressurized water into a well to force out mineral deposits that may be clogging the geology surrounding the well. If successful, hydrofracting permits more water to flow into the well.

The plaintiffs looked at the house on July 1, 2002, and made an offer that was accepted. They twice returned to the property before the closing to take measurements and to meet with William Neal, who was hired to perform a well inspection. Neal submitted a report after testing the flow of water for one hour. The report indicated there was an average flow rate of 4.5 gallons per minute, which is suitable for family use. When he testified, Neal admitted that the statement in his report that the well recovery rate in and of itself "does not determine the capacity of the well to produce water," was not completely accurate.

During one of the plaintiffs' visits to the property, the defendant tried to explain hydrofracting to Darin Dockter. Darin Dockter asked the defendant if there was a problem with the well. The defendant responded that there was no problem with the well but that he had hydrofracted it because his neighbors had hydrofracted their wells to increase the water flow. The plaintiffs moved into the property several days after the closing at the end of August, and the next day the well ran dry.

The plaintiffs called on Eastern Drill Company (Eastern) for assistance. Randall Auclair and Andre Barabe, both of Eastern, testified about the services they had performed on the well for both the plaintiffs and the defendant. They hydrofracted the well for the defendant in the fall of 2001 with little or no improvement in the recovery rate. In 2002, Auclair recommended that the plaintiffs deepen the well from 600 to 1000 feet and have a zoned hydrofracting performed. There was no guarantee of success. The recommended work was performed at a cost of $25,000, but it provided little improvement in the water flow rate. According to Auclair, wells previously had been dug in most areas of the property without success, and the only area in which a well had not been dug was near the septic field, which had to be skirted to avoid contaminating the

well. The cost of digging another well was $40,000, and there was no guarantee of success. The plaintiffs chose to wait. Auclair testified that the test performed by Neal prior to the closing demonstrated only how well the pump worked; it did not measure the well's recovery rate.

Barabe, a well driller and pump expert, had worked on the well for the defendant in 2001 and for the plaintiffs in 2002. He, like Auclair, saw the parts of two or three pumps lying in the area of the well in 2002 that were not present in 2001. The pump Barabe pulled out in 2002 was not the pump that he had worked on at the well in 2001. He thought that someone else had worked on the pump after he had provided services for the defendant in 2001 and before he did work for the plaintiffs in 2002. According to Barabe, the well can be filled with 11,500 gallons of water without recovery and that a pump burns out when it pumps dry. Barabe did not perform hydrofracting services for any of the neighboring properties.

Lori Slowik, the defendant's first wife, and the defendant purchased the property in 1990. Two weeks before closing in December, 1990, the well went dry. Another well was dug, but it too went dry. A third well then was constructed. The third well performed well until 1995 when the pump burned out. A new pump was installed, but Lori Slowik had to use her water consuming appliances with care. She could not operate them simultaneously. She divorced the defendant and moved from the property in 1998.

According to the defendant, after the third well was dug in 1990, he had no problems with the water until 1995 when the pump burned out. Thereafter, there were no water restrictions for showers, laundry, hot tub, dishwasher, grass and shrubbery. In 2001, just before he married his second wife, the well failed, and he

called Eastern. Representatives of Eastern recommended hydrofracting the well but stated that Eastern could not perform the services prior to the defendant's wedding. Because the wedding reception was to be held at the property, the defendant had a water supplier connect a water truck to the house for several days. According to the defendant, after the hydrofracting was performed, there were no restrictions on water use or problems with the well. Because the defendant and his second wife wanted to have a home of their own and to be closer to their places of employment, the defendant sold the property to the plaintiffs.

Dale Ursin, who has lived across the street from the subject property since 1994, testified that he saw a water wagon on the property on two occasions. The first instance occurred in the fall of 2001 when there was a party at the house, and the truck remained for several days. He saw a second water truck on the property about the time the house was sold to the plaintiffs.

Due to the property's limited water supply, the plaintiffs obtain their drinking water every weekend in gallon jugs from Salmon Brook, use a commercial Laundromat for washing their clothing, hand wash dishes—except for a sterilizing rinse in the dishwasher, use toilets two or three times per flush and rotate taking showers. Also, they cannot have a garden or entertain guests on the property.

The court set out the elements of an action in fraud: A false representation made as a statement of fact, the statement was untrue and known to be untrue by the party making it, the statement was made to induce the other party to act on it and the other party acted on it to his injury. See *Kilduff* v. *Adams, Inc.*, 219 Conn. 314, 329, 593 A.2d 478 (1991). It noted that although the elements of fraud must be proved by clear and convinc-

ing evidence, damages may be proved by the preponderance of the evidence. See id., 326–30.

The court concluded that the plaintiffs were entitled to rely on the defendant's statement in the residential property disclosure report that there were no water problems as to quality or quantity. The court noted that the report became part of the parties' contract of sale. The court found that the defendant had discussed with Darin Dockter the hydrofracting done in September, 2001. In response to Darin Dockter's question, "Was there a problem with the well?" the defendant falsely represented the fact that there was no problem. He volunteered that the well had been hydrofracted in 2001, saying that he had done so because his neighbors had hydrofracted their wells to increase the flow of water. In fact, the defendant had called in Eastern because there was little or no water coming from the well, and the recommended hydrofracting provided little improvement. The defendant obtained water from a water truck at the time of his second wedding. Furthermore, Eastern had not provided hydrofracting services to any of the neighboring properties.

The court, citing *Bernard* v. *Gershman*, 18 Conn. App. 652, 656–57, 559 A.2d 1171 (1989), reasoned that the defendant's failure to make a full disclosure about the condition of the well was a false representation to induce the plaintiffs to purchase the property. The defendant knew of the well's continuing problem as evidenced by Barabe's observations that someone other than he had worked on the well between September, 2001, and the time he worked on the well for the plaintiffs. The defendant also knew from his conversations with Auclair that the well could be filled with water from an outside source. Water from an outside source would be sufficient to provide a satisfactory water flow rate for the test performed by Neal. The defendant should have made a full disclosure of the condition of

the well, and his failure to do so was the equivalent of an intentional false representation made to induce the plaintiffs to purchase the property.

The court also concluded that there was no reason for the plaintiffs to change their reliance from the defendant's representations to those of Neal. Neal was hired to do the radon and septic tank testing. He used the same water to test the septic system's capacity that he used to record the well's water flow rate. The court considered the disclaimer in Neal's report that "this test is neither a guarantee nor a warranty of the ability of the well to provide water in similar amounts in the future," to conclude that there was no reason for the plaintiffs to switch their reliance on the defendant's representations of his twelve year experience with the water supply to a one hour test with such a disclaimer.

The court explained that generally, relief is restricted to reasonably foreseeable damages that flow from the character of the representation itself and the ability to mitigate damages but that there are exceptions. See *Miller* v. *Appleby*, 183 Conn. 51, 58, 438 A.2d 811 (1981). The situation at the property is not one with a guaranteed remedy. The only area on the property where a well had not been dug was in the area of the septic system, which presented the potential for pollution. There was no guarantee that a well dug in that area would provide an adequate water supply, and it would cost $40,000 to dig. The plaintiffs did not bargain to have a water truck or tower on their property, as the defendant suggested, even if they were permitted to do so.

To make the plaintiffs whole as a result of the defendant's fraudulent conduct, the court ordered rescission of the contract and that the defendant pay the plaintiffs the purchase price of $317,000, $25,000 for the cost of deepening and hydrofracting the well, and attorney's

fees. The plaintiffs were ordered to convey the property back to the defendant. The defendant appealed from the judgment.

I

The defendant's first claim is that he is entitled to a judgment in his favor, as a matter of law, because there was no evidence that the plaintiffs actually, reasonably relied on his misrepresentation when they entered into the purchase contract.[3] We do not agree.

The defendant has not raised a claim regarding the court's factual findings or its legal conclusion that he committed fraud with respect to the well on the property.[4] Instead, he argues that, as a matter of law pursuant to *Giametti* v. *Inspections, Inc.*, 76 Conn. App. 352, 824 A.2d 1 (2003), he cannot be held liable for the representations he made on the residential property disclosure report. We use the plenary standard to review a trial court's conclusions of law. *Weinstein* v. *Weinstein*, 87 Conn. App. 699, 708, 867 A.2d 111, cert. granted on other grounds, 273 Conn. 934, 875 A.2d 545 (2005). "Where legal conclusions are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts found by the [court]." *Bernard* v. *Gershman*, supra, 18 Conn. App. 656.

The simple answer to the defendant's argument regarding *Giametti* v. *Inspections, Inc.*, supra, 76 Conn. App. 352, is that the facts are distinguishable. Unlike

[3] We note that there is a distinction between actual reliance and reasonable reliance. The defendant has not distinguished the two in his brief but relies primarily on *Giametti* v. *Inspections, Inc.*, 76 Conn. App. 352, 824 A.2d 1 (2003), to argue that he cannot be held liable for his representations in the residential property disclosure report.

[4] In a one sentence footnote, the defendant "vigorously denies committing any fraud or misrepresentation, intentional or otherwise." He has not, however, raised a claim on appeal of insufficient evidence of fraud or that the court applied an improper standard of fraud.

the situation here, the defendant owner in *Giametti* did not know of the carpenter ant infestation at the time she signed the residential property disclosure report. The trial court there did not find that the defendant was guilty of fraud but that she made a negligent misrepresentation. Id., 357. In reversing the judgment, this court held that a plaintiff may seek relief under § 20-327b "only for a *knowing* misrepresentation in the statutory report." (Emphasis in original.) Id. In this case, the court found that the defendant had known for many years of the well's limited ability to produce water and that he was guilty of fraud. For this reason, *Giametti* does not control this case.

The defendant also argues that *Giametti* cannot be distinguished on the basis of fraudulent, as opposed to negligent, misrepresentation and that there was no finding that the plaintiffs relied on his misrepresentations. First, the court found that the plaintiffs were entitled to rely on the residential property disclosure report to sign the contract.[5] Although the court did not articulate the statement as a finding of fact, we cannot construe it in any fashion other than to address the element of reliance necessary to prove fraud. The court's finding is implicit, if not explicit. Second, the court found more than one instance in which the defendant misrepresented to the plaintiffs the condition or quality of the well.

This court addressed a disquietingly similar factual situation and legal claim years ago in *Bernard* v. *Gershman*, supra, 18 Conn. App. 652. In that case, the "plaintiff purchased a house from the defendants in April, 1987. After her first visit to the house with an agent, she made an offer that was accepted. Before the closing,

---

[5] Both plaintiffs testified that they relied on the defendant's disclosure on the residential property disclosure report, and Darin Dockter testified that he also relied on his conversation with the defendant.

she went to the house to take some measurements. At that time, the defendants showed her how to work the water pump. They told the plaintiff to be careful not to run more than one water using appliance at a time, but said that with regard to the water supply she could 'lead a normal life.' The day after she moved into the house, the system ran out of water after two flushes of the toilet and two showers. Even with minimal use, the system ran out of water. The plaintiff had the well tested for its recovery rate and discovered that the depth of the well and the recovery rate were not adequate for normal household purposes." Id., 654.

"Usually, mere nondisclosure does not amount to fraud. . . . Nondisclosure may, however, amount to fraud when there is a failure to disclose known facts under circumstances that impose a duty to speak. . . . In addition, once a vendor undertakes to speak on a subject, the vendor must then make a full and fair disclosure as to that subject." (Citations omitted.) Id., 656. In *Bernard*, this court concluded: "There is no merit to the claim made by the defendants that once the plaintiff had signed the contract, their subsequent misrepresentations could not have induced the plaintiff to purchase the property. At least until title passed and the purchase price was paid, the plaintiff had the right to refuse to accept a deed and to recover any provable damages. . . . An action will lie for a fraudulent nondisclosure that causes one to continue in a course of action." (Citation omitted.) Id., 656–57; see also *Miller* v. *Appleby*, supra, 183 Conn. 56 (seller misrepresented capacity of septic system).[6]

---

[6] It appears that this case is another in the line of cases, including *Miller* and *Bernard*, that the Uniform Property Disclosure Condition Act, General Statutes § 20-327b, sought to avoid. "[T]his bill will help to resolve many problems of miscommunications which frequently complicate and sometimes prevent residential closings from going forward by making it clear what a seller has disclosed to the buyer about the property. 38 H.R. Proc., Pt. 19, 1995 Sess., p. 6966. . . . [T]his bill will resolve some of the communication issues that occur between a seller and a buyer and hopefully, *loss*

The conclusion of this court in *Bernard* is applicable to the facts of this case as well. First, the defendant misrepresented on the residential property disclosure form facts about the quality and quantity of the water on the property. Second, the defendant took the initiative to ask Darin Dockter about the result of the well test and responded in the negative to Darin Dockter's direct inquiry about ever having had a problem with the well. The defendant also misrepresented to Dockter the reason he had had the well hydrofracted.

For these reasons, the court concluded properly that the plaintiffs relied on the defendant's representations that there was no problem with the quantity of water in the well.

## II

The defendant's second claim is that the court improperly awarded the equitable remedy of rescission despite the fact that the plaintiffs did not elect rescission promptly and offer to restore the parties to the status quo ante. We decline to review this unpreserved claim.

We have gleaned the following procedural history from our review of the record and trial court file.[7] The complaint the plaintiffs served on the defendant to commence this action alleged a cause of action for fraudulent misrepresentation and money damages but did not allege the elements of rescission or include a prayer for rescission. The prayer for relief, however, included a request for "such other relief as the court deems fair

---

*of litigation occurs there* . . . . Id., p. 6969." (Emphasis added; internal quotation marks omitted.) *Giametti* v. *Inspection, Inc.*, supra, 76 Conn. App. 360. As this case so clearly demonstrates, the act cannot meet its intended purpose of reducing litigation until all vendors take responsibility to make adequate disclosure regarding the condition of property.

[7] "We may take judicial notice of the contents of the court's file." *State* v. *Pagan*, 75 Conn. App. 423, 431, 816 A.2d 635, cert. denied, 265 Conn. 901, 829 A.2d 420 (2003).

and proper." On June 2, 2003, the plaintiffs filed a motion for permission to amend their complaint to add two counts and, most relevantly, to add a prayer for rescission. The defendant did not file an objection to the request to amend but sent a letter about the request to amend the complaint to the court's case flow office, in which he claimed merely to be prejudiced, but without explanation.[8] Although the motion to amend apparently was presented to two different courts,[9] neither court ruled on the motion to amend in proceedings prior to the presentation of evidence, a practice this court does not condone.[10] Nonetheless, the parties

[8] The letter from the defendant's counsel stated, in part: "On May 19, 2003, after deposing his clients, I suggested to [the plaintiffs' counsel] that by including a negligent misrepresentation count, I might be able to convince my client's umbrella liability insurance carrier to provide coverage. . . . . [O]n the eve of trial, [the plaintiffs' counsel] is attempting to amend the ad damnum clause by requesting a rescission of the contract of sale between the parties and a return of the consideration paid by the plaintiffs to the defendant. The granting of such a request would be severely prejudicial to my client. . . . If necessary, I will file a formal Objection to the Motion to Amend."

[9] The record contains no transcript of the argument before the court, *Berger, J.* The appellant is responsible for providing an adequate record for our review. Practice Book § 60-10.

[10] On September 18, 2003, prior to the beginning of evidence, the following colloquy took place between the trial court and counsel:

"The Court: I note from the file that the complaint is dated December 31, 2002, and, was the amendment granted?

"[The Plaintiffs' Counsel]: It was not ruled on, Your Honor. . . . No. Judge Berger indicated he would leave that up to the trial judge . . . .

"The Court: Oh. Is there any objection to the amendment?

"[The Defendant's Counsel]: There is, Your Honor. The amendment— there was a question, at one point, if there was a possibility of having some insurance coverage on this case. That possibility has been explored, and it's not available. [The plaintiffs' counsel], I believe, was trying to put in some type of language in there that would allow some type of negligence count. The reason I haven't objected—I haven't objected to that is [because] the amended complaint goes on to change the ad damnum clause and claim a rescission of the sale so that they're changing the profile of the case by trying to change the damages claimed in the amended complaint. And beyond that, the negligence claims would not be covered by any insurance policy anyways . . . .

agreed to present evidence and to let the court decide whether to grant the amendment after it had heard all the evidence. See footnote 10. After the plaintiffs rested, the defendant did not move for a directed verdict on the basis of the plaintiffs' not having presented evidence of their offer to rescind the contract. At the conclusion of the evidence, the parties were instructed by the court to submit simultaneous briefs and thereafter to present oral argument. The substance of the argument in the defendant's posttrial brief was that the plaintiffs did not prove the element of reliance in their fraud case. The plaintiffs argued for rescission in their posttrial brief. At oral argument before the court, the defendant's counsel argued that the defendant did not have the mens rea to defraud the plaintiffs and that the court should not grant the extraordinary remedy of rescission because the plaintiffs had the option of placing a water tank on the property to supply water. At no time did the defendant argue that the plaintiffs failed promptly

* * *

"The Court: You indicated that Judge Berger took the papers on the motion to amend?

"[The Plaintiffs' Counsel]: He declined to rule on it, Your Honor. He said he would leave that up to the trial judge. On the motion to amend, you mean?

"The Court: Yes.

"[The Plaintiffs' Counsel]: Yes. He said he would leave that up to the trial judge.

"The Court: Oh, was the answer filed at the time he—

"[The Plaintiffs' Counsel]: No, it was not. In fact, he ordered that the answer be filed at that time.

"The Court: All right. Did he—since—I'll not make a—I'm not going to handle it as a separate—or I'll handle that as a separate matter, but I'll assume that, if I pool that, it's okay to allow it, so, at the end of the trial, we'll have a separate—because I'll have all the evidence—

"[The Defendant's Counsel]: Yes.

"The Court:—at that point—

"[The Defendant's Counsel]: Yes.

"The Court:—and I can have a separate hearing as to whether or not the sixth and seventh count should be included.

"[The Plaintiffs' Counsel]: Thank you, Your Honor.

"[The Defendant's Counsel]: Thank you, Your Honor."

to elect to rescind the contract or that they had failed to plead or to prove that they had offered to rescind the contract.[11]

For the first time on appeal, the defendant claims that the plaintiffs did not elect promptly to rescind the contract. "[T]he theory upon which a case is tried in the trial court cannot be changed on review . . . . Moreover, an appellate court should not consider different theories or new questions if proof might have been offered to refute or overcome them had they been presented at trial." (Internal quotation marks omitted.) *Rinaldi* v. *Enfield*, 82 Conn. App. 505, 517, 844 A.2d 949 (2004). "Our rules of procedure do not allow a [party] to pursue one course of action at trial and later, on appeal, argue that a path he rejected should now be open to him. . . . To rule otherwise would permit trial by ambuscade." (Internal quotation marks omitted.) *Pekera* v. *Purpora*, 273 Conn. 348, 361, 869 A.2d 1210 (2005).

This court has said many times that it will not review a claim that is not distinctly raised at trial. Practice Book § 60-5. "A claim is distinctly raised if it is so stated as to bring to the attention of the court the precise matter on which its decision is being asked. . . . A claim briefly suggested is not distinctly raised." (Internal quotation marks omitted.) *Solomon* v. *Hall-Brooke Foundation, Inc.*, 30 Conn. App. 129, 134, 619 A.2d 863 (1993).

*Baker* v. *Cordisco*, 37 Conn. App. 515, 521–23, 657 A.2d 230, cert. denied, 234 Conn. 907, 659 A.2d 1207 (1995), is instructive. In *Baker*, the plaintiff claimed that

---

[11] "As a condition precedent to a rescission, the [plaintiffs were] required to allege and prove that [they] had restored or offered to restore [the defendant] to [his] former condition as nearly as possible." (Internal quotation marks omitted.) *Wallenta* v. *Moscowitz*, 81 Conn. App. 213, 228 n.8, 839 A.2d 641, cert. denied, 268 Conn. 909, 845 A.2d 414 (2004).

the trial court improperly permitted "the defendant to file a special defense on the eve of trial and, in turn, ordered the plaintiff to respond to that defense." Id., 521. On appeal, the plaintiff argued that the court "deprived her of constitutional due process and the fifteen day filing period provided by the rules of practice for filing responsive pleadings." Id. The plaintiff, however, did not assert before the trial court her claims of a violation of due process or the rules of practice. Id., 521–22. "The plaintiff did, however, assert before the trial court an argument that she would be prejudiced if the defendant were allowed to amend the pleadings by filing a special defense that claimed that the [motor vehicle collision at issue] was caused by the sole negligence of [a third party]. The plaintiff asserted that she might be required to seek a continuance or further discovery or to take other action in order to prevent surprise and prejudice." Id., 522. The plaintiff did not seek a continuance or demonstrate prejudice; id., 523; although the trial court agreed to meet those requests when and if they were made. Id., 522 n.5. This court declined to review the plaintiff's claims of a due process violation and a violation of the rules of practice because they were not distinctly raised in the trial court. Id., 522.

"When a party raises a claim for the first time on appeal, our review of the claim is limited to review under either the plain error doctrine as provided by Practice Book § 60-5, or the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989)." *State* v. *Rodriguez*, 68 Conn. App. 303, 308, 791 A.2d 621, cert. denied, 260 Conn. 920, 797 A.2d 518 (2002). The defendant here, however, has not requested either plain error or *Golding* review of his unpreserved claim. This court often has noted that "it is not appropriate to engage in a level of review that is not requested." (Internal quotation marks omitted.) Id. When "the parties have neither briefed nor argued plain error [or

*Golding* review], we will not afford such review. See *Lynch* v. *Granby Holdings, Inc.*, 230 Conn. 95, 99, 644 A.2d 325 (1994)." *Baker* v. *Cordisco*, supra, 37 Conn. App. 522 n.4. For these reasons, we decline to review the defendant's second claim on appeal.

## III

The defendant's third claim is that the court abused its discretion by permitting a fact witness to render expert testimony because the witness had not been disclosed as an expert as required by Practice Book § 13-4 (4).[12] We disagree because even if we were to assume that the court abused its discretion by admitting the testimony, which we do not, the error was harmless because the defendant has not demonstrated that he was prejudiced by the testimony.

During their case-in-chief, the plaintiffs called Auclair, a well drilling contractor, to testify. The plaintiffs' counsel inquired about Auclair's background and experience without objection. Auclair testified that he has been in the well drilling business since 1952 and has been a principal of Eastern, a business that provides well drilling services, since 1967. During the respective times that they owned the property, both the defendant and the plaintiffs called on Auclair and his company to provide services for the well on the property. Auclair testified about water flow in a well, the type of test needed to assure adequate water flow, hydrofracting, soil composition, well repair in general and the type of

---

[12] Practice Book § 13-4 (4) provides in relevant part: "[A]ny plaintiff expecting to call an expert witness at trial shall disclose the name of that expert, the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion, to all other parties within a reasonable time prior to trial. . . . If disclosure of the name of any expert expected to testify at trial is not made in accordance with this subdivision . . . such expert shall not testify if, upon motion to preclude such testimony, the judicial authority determines that the late disclosure (A) will cause undue prejudice to the moving party . . . ."

services he had provided to each of the parties. The defendant did not object to that portion of Auclair's testimony. Auclair, however, compared himself to a physician when assessing the situation at a well in that he observes the area of the well to determine the problem, if any. With respect to the well at issue here, he determined that it was a problem well. The defendant's counsel objected, stating that Auclair was giving expert testimony and that he had not been disclosed as an expert witness.[13] The defendant's counsel also objected when Auclair testified as to the reasons a pump may burn out.

"The standard of review we apply to a trial court's evidentiary rulings is well settled. Such rulings are enti-

---

[13] The transcript reveals the following with regard to Auclair's testimony and the defendant's evidentiary claim:

"[The Plaintiffs' Counsel]: And you are familiar with the property you've worked on both for [the defendant and the plaintiffs]? What is the water situation there with respect to wells, and what are the options that are available to [the plaintiffs]?

"[The Witness]: In my experience, the property that we speak of is a difficult piece of geology to construct the well in. There's several factors that create this one. It's a mica schist formation that sometimes—or many times we find mica schist more difficult to get water in than any other geology that I work in. . . . The—one of the problems [the defendant] had made me aware when I first talked to him was that they had to recase his well because of a cave-in condition, the rock was so soft.

"[The Plaintiffs' Counsel]: What does that mean?

"[The Witness]: That means that additional casing had to be seated into the well to hold the well from collapsing upon itself. . . .

"[The Plaintiffs' Counsel]: Okay. Did [the defendant] indicate to you, when you spoke with him, that he had had any other problems with his well or wells?

"[The Witness]: They—we didn't talk about other wells [the defendant] may or may not have drilled on his property. We pretty much stayed with this particular situation, but there were signs around his well that indicated to me that there was a problem well. We—and it's a rule in the well drilling business, the more debris and stuff—drill tools, pump part, etc., you see around the well, the more problematic the well probably is. And one of the things that caught my eye, like a doctor would notice somebody who's very uncomfortable or holding onto his chest or something, these are some of the indicators that I read when I go on a job.

"[The Defendant's Counsel]: Your Honor, if I may, is the witness testifying

tled to great deference. . . . The trial court is given

as to what his general observations in the business are or specific observations that he had on this property? It seems to me like he's almost going into expert testimony speaking as a doctor, but I'm curious about specific—

"The Court: I thought he . . . had already been qualified as an expert, and—

"[The Defendant's Counsel]: Well, he hasn't been disclosed as an expert.

"The Court: Pardon?

"[The Defendant's Counsel]: He has not been disclosed as an expert witness. And I'm not questioning his qualifications. I'm questioning the area of testimony that we're getting in. If he's got specific . . . observations, I have no objection regarding this property. It's when he starts making comments about his abilities to diagnose, quote, unquote, a problem well, but he's not making specific observations about this property. And if there are specific observations, then I withdraw the objection.

\* \* \*

"The Court: I thought this was an observation of this problem well on the property.

"[The Defendant's Counsel]: I'm just speaking to the fact that he seems to be holding himself out as—like he said, as a doctor who could diagnose a situation or make observations about a property. Again, if he's got specific observations—I know he's got experience, I just want to know what the specific observations are. . . .

"[The Plaintiffs' Counsel]: And Mr. Auclair, did you make any observations at this particular property that there was detritus around the well that indicated that this was a problem well?

"[The Witness]: There were signs there to show me that this well had been worked on prior to my being there. . . .

"[The Plaintiffs' Counsel]: Two thousand and one. Okay. Thank you. And that was when you were there with [the defendant]? Correct?

"[The Witness]: That's correct.

"[The Plaintiffs' Counsel]: Alright. And what signs, at that time, did you see—what physical things did you see that, based on your experience, indicated to you that this well had had problems in the past?

"[The Witness]: I saw, on the ground next to the well, a pump—pump end; that is, the end of the pump that pumps, and I saw two motors that I assumed were burned out motors or motors that had worn out. Generally, a motor is damaged from heat. Heat could be from lightening or it could be from lack of water.

"[The Plaintiffs' Counsel]: Why would heat occur from lack of water?

"[The Witness]: Well, what happens is that when a pump operates, it's pumping water. The—it needs—

"[The Defendant's Counsel]: Your Honor, I'm going to object to this line of questioning again. He has not been disclosed as an expert witness. I have no objection to him [testifying] to his observations on this property. There's been no formal disclosure of him as an expert witness. Without that, I'm

broad latitude in ruling on the admissibility of evidence, and we will not disturb such a ruling unless it is shown that the ruling amounted to an abuse of discretion. . . . Even when a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful." (Internal quotation marks omitted.) *Madsen* v. *Gates*, 85 Conn. App. 383, 399, 857 A.2d 412, cert. denied, 272 Conn. 902, 863 A.2d 695 (2004). "[B]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating

going to need time to get my own expert to give me my own opinions regarding conditions of wells and why pump motors would need to be replaced and things like that. His observations I have no problem with; he's got a lot of experience, but he hasn't been disclosed as an expert, and we haven't had an opportunity to examine him as an expert. . . .

"[The Plaintiffs' Counsel]: They did take his deposition, Your Honor. But it seems to me that, based on not a hypothetical but what he saw on this property, he has indicated that he has got enough experience to testify, based on what he saw on this property, as to this well, what the indicators were that there was a problem with the well. I don't think he necessarily had to be disclosed as an expert to testify as to that. He worked on the well. This isn't an expert we're calling in to judge somebody else's work; this is his own work he's testifying about.

"[The Defendant's Counsel]: I would agree to the extent that he talks about the condition of the well that he worked on. Right now, he's about to testify about pump motors and why they would have been and why they would have needed to be replaced. He didn't work on those pump motors. He didn't replace them. There's been no disclosure that he's a pump motor expert in any way. He worked on the well. He didn't work on the pump motors.

"The Court: He's indicated that this is his observation. Even if he's not called as an expert, he's called as a witness, and, of course, he does have a certain expertise to indicate what he observed.

"[The Defendant's Counsel]: For him to say that he saw them there, again, I have no objection. For him to start saying why they were there, I mean, unless he's got . . . some documents that says he's examined those pump motors. . . .

"The Court: He indicated that when he sees motors burned out near a well, in normal circumstances, that they've burned out because of lack of water."

that the error was harmful. . . . The harmless error standard in a civil case is whether the improper ruling would likely affect the result." (Internal quotation marks omitted.) *Urich* v. *Fish*, 261 Conn. 575, 580–81, 804 A.2d 795 (2002).

On the basis of our review of Auclair's testimony that the defendant claims the court improperly admitted, we conclude that the court did not abuse its discretion and that the evidence was not harmful to the defendant. Practice Book § 13-4 (4) is "intended to furnish a [party] with the details of [another party's] reliance on expert testimony in order to assist him with the preparation of his case. The rules of discovery are designed to make a trial less a game of blindman's [buff] and more of a fair contest with the basic issues and facts disclosed to the fullest extent possible." (Internal quotation marks omitted.) *Barrows* v. *J.C. Penney Co.*, 58 Conn. App. 225, 231–32, 753 A.2d 404, cert. denied, 254 Conn. 925, 761 A.2d 751 (2000).

In this instance, the defendant knew that Auclair was to testify at trial and, in fact, deposed him prior to trial. The defendant objected to Auclair's comparing the manner in which he evaluates a well to the way in which a physician may observe a patient for signs of illness or disease. On the basis of his having observed broken pump parts scattered at the site of the well in question, Auclair testified that he knew that it was a problem well. The first step in our analysis, to continue the physician analogy, is to note that this court has held that treating physicians who are not disclosed as expert witnesses are limited in their testimony to facts within their personal knowledge, such as observations of a patient's condition. *Sung* v. *Butterworth*, 35 Conn. App. 154, 158–59, 644 A.2d 395 (1994), appeal dismissed, 235 Conn. 400, 665 A.2d 893 (1995). There is no reason that the same rule should not apply in this case. The defendant did not object to Auclair's testifying on the

basis of his observations. In rebuffing the defendant's objection, the court stated that Auclair testified, on the basis of his observations at the well after his services were requested by the defendant, that the well was a problem well. We agree with the court.

Although we conclude that the court did not abuse its discretion in permitting Auclair to testify on the basis of his observations at the well, we also note that the defendant was not prejudiced by this testimony. Even though Auclair's testimony comparing himself to a physician was not responsive to the question asked, we agree with the plaintiff that in this instance, where the case was tried to the court, the testimony was harmless. Furthermore, the substance of Auclair's assessment that the well was a problem well was to state the obvious. One need not be an expert to know that a well intended to provide water for a single-family home is a problem well if it does not produce enough water. That question, however, is different from one asking why the well does not produce enough water. We note that the defendant did not object to the plaintiffs' questions concerning the reason the well did not produce water. We also observe that although the defendant objected to Auclair's providing expert testimony, he himself propounded hypothetical questions to the witness.[14] For these reasons, we conclude that the court

---

[14] On cross-examination, the defendant's counsel questioned Auclair, in part, as follows:

"[The Defendant's Counsel]: Okay. You testified about your experience with wells.

"[The Witness]: Yes.

"[The Defendant's Counsel]: Would you agree or disagree that if you've got a—what a consumer or what a customer considers a problem well, that one of the possible courses—causes—or one of the possible drains on that well could be, for example, a leaking toilet—chronically leaking toilet; in other words, a toilet that keeps running, never stops the floating device?

"[The Witness]: I can tell you that I have seen wells that are depleted of water because of a leaking toilet, and I would add to that, for your edification, that once that leaking toilet was taken care of, if the well had adequate water, then it would immediately recover."

properly admitted Auclair's testimony that the well in question was a problem well.

The judgment is affirmed.

In this opinion the other judges concurred.