COMMISSIONER OF MENTAL HEALTH AND
ADDICTION SERVICES ET AL.
*v.* MEHDI M. SAEEDI ET AL.
(AC 34366)

Gruendel, Sheldon and Peters, Js.

Argued February 14—officially released July 9, 2013

*Gary W. Hawes*, assistant attorney general, with whom were *Nancy A. Brouillet*, assistant attorney general, and, on the brief, *George Jepsen*, attorney general, and *Gregory T. D'Auria*, solicitor general, for the appellants (plaintiffs).

*Kathleen Eldergill*, for the appellee (named defendant).

*Charles Krich*, principal attorney, for the appellee (defendant Commission on Human Rights and Opportunities).

*Opinion*

GRUENDEL, J. The plaintiffs, the Department of Mental Health and Addiction Services (department), the former commissioner of the department, Thomas A. Kirk, Jr., and Connecticut Valley Hospital (hospital) employees Barbara Forgit, Stuart Forman, Luis Perez, Leonard Lev and Helene Vartelas, appeal from the judgment of the trial court dismissing their administrative appeal from a decision of the defendant Commission on Human Rights and Opportunities (commission) human rights referee (referee), finding that the plaintiffs violated General Statutes (Rev. to 2007) § 4-61dd[1] by retaliating against the other defendant, Mehdi M. Saeedi, on

[1] General Statutes (Rev. to 2007) § 4-61dd provides in relevant part: "(a) Any person having knowledge of any matter involving corruption, unethical practices, violation of state laws or regulations, mismanagement, gross waste of funds, abuse of authority or danger to the public safety occurring in any state department or agency . . . may transmit all facts and information in such person's possession concerning such matter to the Auditors of Public Accounts. The Auditors of Public Accounts shall review such matter and report their findings and any recommendations to the Attorney General. Upon receiving such a report, the Attorney General shall make such investigation as the Attorney General deems proper regarding such report and any other information that may be reasonably derived from such report. . . . Upon the conclusion of the investigation, the Attorney General shall where necessary, report any findings to the Governor, or in matters involving criminal activity, to the Chief State's Attorney. . . .

"(b) (1) No state officer or employee, as defined in section 4-141, no quasi-public agency officer or employee, no officer or employee of a large state contractor and no appointing authority shall take or threaten to take

account of his whistle-blowing activities. On appeal, the plaintiffs claim that the court erred in concluding that the referee properly determined that (1) the thirty day filing period for filing whistle-blower retaliation complaints was not a jurisdictional limitation, (2) the thirty day filing period for whistle-blower retaliation

any personnel action against any state or quasi-public agency employee or any employee of a large state contractor in retaliation for such employee's or contractor's disclosure of information to (A) an employee of the Auditors of Public Accounts or the Attorney General under the provisions of subsection (a) of this section; (B) an employee of the state agency or quasi-public agency where such state officer or employee is employed; (C) an employee of a state agency pursuant to a mandated reporter statute; or (D) in the case of a large state contractor, an employee of the contracting state agency concerning information involving the large state contract.

"(2) If a state . . . agency employee . . . alleges that a personnel action has been threatened or taken in violation of subdivision (1) of this subsection, the employee may notify the Attorney General, who shall investigate pursuant to subsection (a) of this section.

"(3) (A) Not later than thirty days after learning of the specific incident giving rise to a claim that a personnel action has been threatened or has occurred in violation of subdivision (1) of this subsection, a state . . . agency employee . . . may file a complaint concerning such personnel action with the Chief Human Rights Referee . . . . The Chief Human Rights Referee shall assign the complaint to a human rights referee appointed under section 46a-57, who shall conduct a hearing and issue a decision concerning whether the officer or employee taking or threatening to take the personnel action violated any provision of this section. If the human rights referee finds such a violation, the referee may award the aggrieved employee reinstatement to the employee's former position, back pay and reestablishment of any employee benefits for which the employee would otherwise have been eligible if such violation had not occurred, reasonable attorneys' fees, and any other damages. For the purposes of this subsection, such human rights referee shall act as an independent hearing officer. The decision of a human rights referee under this subsection may be appealed by any person who was a party at such hearing, in accordance with the provisions of section 4-183. . . .

"(5) In any proceeding under subdivision (2), (3) or (4) of this subsection concerning a personnel action taken or threatened against any state . . . agency employee . . . which personnel action occurs not later than one year after the employee first transmits facts and information concerning a matter under subsection (a) of this section to the Auditors of Public Accounts or the Attorney General, there shall be a rebuttable presumption that the personnel action is in retaliation for the action taken by the employee under subsection (a) of this section. . . ."

complaints is subject to the continuing course of conduct doctrine,[2] (3) the act of Saeedi's union having filed grievances on his behalf for three of the adverse personnel actions of which he complained did not render that procedure his exclusive remedy, and (4) the commission had jurisdiction to order professional ethics training for department employees and to order the correction of Saeedi's personnel evaluation. We affirm in part and reverse in part the judgment of the trial court.

The following facts, as found by the referee, are relevant to the resolution of the plaintiffs' claims.[3] In 2002, Saeedi, a board certified internist, was hired by the department to work as a principal physician in ambulatory care services at the hospital. While working in this capacity, Saeedi served on several of the hospital's committees, including acting as co-chair of the continuing medical education committee. In 2006, Saeedi received his performance appraisal for the period covering September, 2005, to September, 2006. Saeedi's performance was rated a "five," on a scale of one to five, with "five" indicating a rating of "excellent." His evaluator commented in writing that Saeedi's quality of work was "exceptionally accurate," that he spent a significant amount of time with patients and that his documentation was always thorough. Further, his evaluator noted that Saeedi was "always willing to help [the medical director]," "has excellent interaction with on-call [physicians]," and was "[w]ell-respected by everyone as an outstanding educator." Before August, 2007, Saeedi had never been subject to discipline or accused of any work rule violations.

---

[2] Our case law frames the continuing course of conduct doctrine as one that provides for "a statute of limitations [to] be tolled . . . thereby allowing a plaintiff to commence his or her lawsuit at a later date." (Internal quotation marks omitted.) *Sherwood* v. *Danbury Hospital*, 252 Conn. 193, 202–203, 746 A.2d 730 (2000).

[3] The extensive factual findings of the referee, which total 311 paragraphs, are not at issue in this appeal.

As a principal physician, one of Saeedi's duties included supervising Romeo Sonido, another physician working at the hospital. Saeedi discovered that Sonido was providing poor quality medical care to his patients and had many problems in the medical management of his patients.[4] For example, when an electrocardiogram indicated that one of Sonido's patients had experienced a heart attack, Sonido failed to take any action for nine days. As a result, Saeedi thereafter intervened and treated the patient.

Saeedi attempted to address these problems with Sonido, but Sonido became belligerent and his performance did not improve. There having been no improvement in Sonido's performance, in 2005 or 2006, Saeedi brought his concerns to the attention of the medical director of ambulatory care services. The situation remained unchanged, and in August, 2007, Saeedi began to make a series of reports to various hospital supervisors and administrators, including Forgit, Lev and Forman, about his concerns regarding Sonido's care of patients. Neither Forman, Lev, nor any other supervisor to whom Saeedi made complaints took any action under the medical staff bylaws to improve Sonido's handling of patient care.

In August, 2007, the plaintiffs initiated a series of adverse personnel actions against Saeedi, including (1) threatening to transfer him to a building that would require him to pass through a metal detector that "could cause [his] defibrillator to give him a shock . . . or to

---

[4] In making his complaints, Saeedi described "Sonido's 'practice issues [as] hav[ing] ranged from not addressing the patients' routine abnormal data and [a] lack of providing [a] basic standard of medical care beyond detoxification, to not attending [to] and managing life-threatening conditions.'" Saeedi also noted in a report to Forman that Sonido's "'practice issues, a few of significant concern, have been recurring'" and that there was an "'urgent need for direct and enhanced supervision'" of Sonido.

Two other hospital staff members testified before the referee as having observed deficiencies in the level of care provided to patients by Sonido.

reprogram the defibrillator so that it would not operate properly when needed";[5] (2) reassigning him to a post that required repeated travel among buildings in hot and cold weather, despite his documented medical condition that made exposure to heat and cold dangerous for him; (3) soliciting other employees to file work rule violations against him; (4) failing to follow the department's progressive discipline policy, which focuses on correction of behavior, rather than punishment; (5) filing complaints containing false, unsupported allegations against him, resulting in two unpaid suspensions from work; and (6) downgrading his performance appraisal scores to indicate a rating of "unsatisfactory," notwithstanding his demonstrated competence in providing patient care.[6]

On October 16, 2008, Saeedi filed a complaint with the chief human rights referee alleging that the plaintiffs[7] had retaliated against him for his whistle-blowing activities in violation of § 4-61dd.[8] The plaintiffs filed their answer denying that they had taken or threatened to take any retaliatory personnel action against Saeedi. In their answer, they pleaded a single special defense: "The [o]ffice of [p]ublic [h]earing[s] has no subject matter jurisdiction over this complaint because [Saeedi] has failed to satisfy the prerequisites for protection under . . . § 4-61dd."

On May 19, 2010, less than one week prior to the public hearing before the referee was scheduled to

[5] The referee found that Saeedi explained to Forgit the specific dangers that the metal detector posed to him, but Forgit refused to change his reassignment.

[6] After two unsatisfactory performance evaluations, an employee is subject to dismissal.

[7] Saeedi also named in his complaint Jane Buss, a physician who worked at the hospital as the medical director of ambulatory care services. On February 17, 2009, Saeedi withdrew his complaint against Buss.

[8] Saeedi's union also filed grievances challenging his reassignment and suspensions.

begin, the plaintiffs filed a motion to dismiss, alleging, inter alia, that the office of public hearings had no jurisdiction over Saeedi's complaint because (1) he had filed grievances through his union, and, therefore had elected to pursue his remedies through his collective bargaining agreement, and (2) it was untimely. Saeedi objected to the plaintiffs' motion, arguing that the bases articulated in the plaintiffs' motion to dismiss did not implicate the subject matter jurisdiction of the office of public hearings, that the plaintiffs failed to raise in their answer any of the claims discussed in their motion to dismiss as affirmative defenses, and, therefore, they had waived the opportunity to raise them. The referee denied the motion to dismiss because "some of the reasons given by the [plaintiffs] to dismiss the complaint had existed since the October, 2008 filing of the complaint; other reasons were nonjurisdictional; and other reasons given were [according to the evidence submitted by Saeedi] simply untrue." On May 25, 2010, the matter proceeded to a seven session public hearing before the referee. On October 14, 2010, the referee took evidence and heard argument on damages, after which the record closed.

On December 9, 2010, the referee issued his final decision, finding, inter alia, that Saeedi was not barred from "pursuing both his whistle-blower retaliation complaint and his grievance[s]," that the continuing course of conduct doctrine applies to the filing period prescribed in § 4-61dd and that Saeedi had "established by a preponderance of [the] evidence that the [plaintiffs] violated . . . § 4-61dd." The referee ordered that the plaintiffs (1) reimburse Saeedi for his salary and lost wages and credit him for lost vacation, sick leave or accrued length of service; (2) pay to Saeedi $40,000 in emotional distress damages, $123,765.25 in attorney's fees and costs and $2641 in prejudgment interest; (3) issue Saeedi a revised performance appraisal for the

period of September, 2007, to September, 2008, "omitting references to the five day and ten day suspensions," retaining the same scores in all categories except "judgment," increasing to "[four]" the scores in the "judgment" category, giving Saeedi "an overall performance rating of 4.375 (excellent)"; (4) refrain from considering the subject disciplinary action taken against Saeedi or the "unsatisfactory" rating on his September, 2008 performance appraisal when considering future personnel actions; (5) purge from Saeedi's official and unofficial personnel files all references to the subject personnel actions; and (6) receive training in professional ethics within nine months of the decision's issuance.

The plaintiffs appealed from the referee's decision to the Superior Court, claiming, inter alia, that the office of public hearings lacked jurisdiction over Saeedi's complaint because (1) the referee's decision was "in excess of the statutory authority granted to the Commission on Human Rights and Opportunities' office of public hearings pursuant to [§ 4-61dd]," and (2) he "previously filed the same claim in the form of two grievances through his union, pursuant to his [c]ollective [b]argaining [a]greement, and thus has elected his remedies." The court determined that the thirty day filing period prescribed by § 4-61dd is not jurisdictional in nature and agreed with the referee's reasoning that the continuing course of conduct doctrine applies to the thirty day filing period. Adopting the reasoning of the referee, the court also found that given the specific terms of Saeedi's collective bargaining agreement, he was not precluded from filing a complaint with the commission after his union had filed grievances challenging the department's adverse personnel actions. The court also found no error in the referee's fashioning of remedies, concluding that in light of the remedial purpose of § 4-61dd and the referee's finding that

Saeedi's performance appraisal was tainted with retaliatory animus, the referee's order that the review be revised to reflect an accurate appraisal was appropriate. Under the specific facts of this case, the court also found that the referee had the authority to order the plaintiffs to take a professional ethics class. Finding that the conclusions of law reached by the referee resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts, the court dismissed the plaintiffs' appeal. From that decision of the court, the plaintiffs now appeal.

I

THIRTY DAY FILING PERIOD UNDER § 4-61dd

The plaintiffs first argue that the office of public hearings lacked subject matter jurisdiction to entertain Saeedi's claims because the filing of his complaint was untimely. We disagree.

"[O]nce the question of lack of jurisdiction of a [tribunal] is raised . . . [it] must be disposed of no matter in what form it is presented . . . and the court must fully resolve it before proceeding further with the case." (Internal quotation marks omitted.) *Pine* v. *Dept. of Public Health*, 100 Conn. App. 175, 179, 917 A.2d 590 (2007). We, therefore, address first the plaintiffs' claim regarding the jurisdiction of the office of public hearings.

"We have long held that because [a] determination regarding a [tribunal's] subject matter jurisdiction is a question of law, our review is plenary. . . . Subject matter jurisdiction involves the authority of the [tribunal] to adjudicate the type of controversy presented by the action before it. . . . [A tribunal] lacks discretion to consider the merits of a case over which it is without jurisdiction . . . . The subject matter jurisdiction

requirement may not be waived by any party, and also may be raised by a party, or by the [tribunal] sua sponte, at any stage of the proceedings, including on appeal." (Internal quotation marks omitted.) Id., 180.

"The question of whether a statutory time limitation is subject matter jurisdictional is a question of statutory interpretation." (Internal quotation marks omitted.) *Williams* v. *Commission on Human Rights & Opportunities*, 257 Conn. 258, 267, 777 A.2d 645 (2001). "Thus, we look to whether the legislature intended the time limitation to be jurisdictional. The legislative intent is to be discerned by reference to the language of the statute, its legislative history and surrounding circumstances, the policy the limitation was designed to implement, and the statute's relationship to the existing legislation and common law principles governing the same subject matter. . . . In light of the strong presumption in favor of jurisdiction, we require a strong showing of a legislative intent to create a time limitation that, in the event of noncompliance, acts as a subject matter jurisdictional bar." (Internal quotation marks omitted.) Id.

Although a statute's "mandatory language may be an indication that the legislature intended a time requirement to be jurisdictional, such language alone does not overcome the strong presumption of jurisdiction, nor does such language alone prove strong legislative intent to create a jurisdictional bar. In the absence of such a showing, mandatory time limitations must be complied with absent an equitable reason for excusing compliance, including waiver or consent by the parties. Such time limitations do not, however, implicate the subject matter jurisdiction of the agency or the court." Id., 269–70.

Section 4-61dd (b) (3) (A) provides in relevant part that "[n]ot later than thirty days[9] after learning of the

---

[9] General Statutes (Rev. to 2007) § 4-61dd (b) (3) (A) was amended in 2011 to allow for a ninety day filing period.

specific incident giving rise to a claim that a personnel action has been threatened or has occurred in violation of subdivision (1) of this subsection, a state or quasi-public agency employee . . . may file a complaint concerning such personnel action with the Chief Human Rights Referee . . . ." The legislature's use of the word "may" rather than "must" or "shall," while not dispositive, suggests that the time limit in § 4-61dd (b) (3) (A) is directory, rather than mandatory. See *Williams* v. *Commission on Human Rights & Opportunities*, supra, 257 Conn. 271 ("[d]efinitive words, such as must or shall, ordinarily express legislative mandates of a nondirectory nature" [internal quotation marks omitted]). Traditionally, it is "strong mandatory language . . . [that] is consistent with the notion of a subject matter jurisdictional limit." Id. As we do not find such strong mandatory language in § 4-61dd (b) (3) (A), we cannot conclude that the text of § 4-61dd (b) (3) (A) makes a "strong showing of a legislative intent"; id., 269; to create a jurisdictional bar to claims filed outside the thirty day period.

Our inquiry, however, does not end with the text of § 4-61dd (b) (3) (A). We also have carefully reviewed the legislative history of § 4-61dd and have discovered no legislative intent that the thirty day filing period act as a jurisdictional bar. In fact, there is no legislative history whatsoever on the subject of the thirty day filing period. The plaintiffs argue that a comment by Representative James A. O'Rourke III, made during the debate on House Bill No. 5487, "An Act Concerning State Employee and Contractor Whistleblowing Complaints"—which ultimately amended § 4-61dd to offer victims of whistle-blower retaliation an administrative process to adjudicate their claims through the commission—indicates that the thirty day filing period was meant to be jurisdictional in nature. Representative O'Rourke stated that "the thought here is to speed up

the processing of these complaints, to streamline it and have a faster decision." 45 H.R. Proc., Pt. 9, 2002 Sess., p. 2871. We note first that the plaintiffs' argument takes this comment out of context. Representative O'Rourke's comments concerned the creation of the administrative process, not the thirty day filing period. His statement, in whole, reads: "The specific section that you refer to would be [the] alternative process here is, the thought here is to speed up the processing of these complaints . . . ." Id. The discussion on the floor that followed related exclusively to the designation of an alternate forum for pursuing whistle-blower retaliation claims, with no mention of the filing period. Furthermore, even if the comment cited by the plaintiffs offered some indication that the legislature intended the thirty day time limit to "speed up" the process of resolving claims, this does not evince a clear intention by the legislature to create a jurisdictional bar.[10]

In light of the dearth of legislative history and textual evidence indicating any legislative intent to create a subject matter jurisdictional bar, and mindful of the

[10] The plaintiffs argue that our Supreme Court has held that the "policy of promoting the speedy and efficient determination of claims supports a conclusion that a statutory time limit is subject matter jurisdictional." We disagree with both their characterization of the cases they cite for this proposition and the conclusion they attempt to draw from them. In support of their argument, the plaintiffs rely exclusively on cases that address statutory appeals periods, rather than cases that concern the original filing of claims. In the cases cited by the plaintiffs, our Supreme Court has stated that the "public policies of promptness and finality" support the conclusion that "*appeal periods* implicate subject matter jurisdiction." (Emphasis added.) *Stec* v. *Raymark Industries, Inc.*, 299 Conn. 346, 364, 10 A.3d 1 (2010); see also *HUD/Barbour-Waverly* v. *Wilson*, 235 Conn. 650, 656, 668 A.2d 1309 (1995); *Ambroise* v. *William Raveis Real Estate, Inc.*, 226 Conn. 757, 628 A.2d 1303 (1993). The plaintiffs point to no authority, nor have we uncovered any, that extends to the initial filing of claims the reasoning applied to statutory appeals periods. In fact, following the logic set forth by the plaintiffs would turn the presumption of jurisdiction on its head, as we cannot imagine a statutory time limit for the filing of claims that does not serve to "[promote] the speedy and efficient determination of claims . . . ."

remedial purpose of § 4-61dd; see part III of this opinion; we conclude that failure to comply with the thirty day filing period did not divest the referee of subject matter jurisdiction. The trial court, therefore, properly found no error in the referee's decision that the office of public hearings had subject matter jurisdiction to hear Saeedi's claims.

The plaintiffs argue, in the alternative, that Saeedi's claims are subject to a mandatory "time limit" or statute of limitations,[11] which may not be tolled by the continuing course of conduct doctrine, making his filing untimely for all but one personnel action of which Saeedi complains. As the plaintiffs have waived this claim, we do not address its merits.

The plaintiffs, in their answer filed in response to Saeedi's complaint to the commission, asserted a single special defense, claiming that the office of public hearings lacked subject matter jurisdiction.[12] In their motion to dismiss filed prior to their hearing before the referee, the plaintiffs again argued that the office of public hearings lacked subject matter jurisdiction over Saeedi's claims, not that Saeedi's claims were barred by a mandatory statute of limitations. Saeedi, in his objection to the plaintiffs' motion to dismiss, argued not only that § 4-61dd did not implicate the subject matter jurisdiction of the office of public hearings, but that any defense the plaintiffs may have had pursuant to the filing period contained in § 4-61dd had been waived because they had failed to plead it in their answer. For the first time,

[11] Although the plaintiffs, in their brief to this court, refer to the thirty day filing period only as a "time limit," based on the case law to which they cite, the arguments raised before the referee and the trial court and the actual substance of their present argument, we have determined that the term of art to which they refer is "statute of limitations." Throughout the remainder of this opinion, we address it as such.

[12] As it is not at issue in this appeal, we make no comment on the propriety of the plaintiffs' raising the referee's subject matter jurisdiction in their answer rather than in a motion to dismiss.

in their trial brief to the referee, the plaintiffs argued that § 4-61dd "mandates a [thirty day] statute of limitation[s] for the filing of a [whistle-blower] complaint," and, accordingly, Saeedi's "allegations are untimely."[13] They did not, however, explain how this purported untimeliness impacted Saeedi's claims. Saeedi, in his trial brief, reiterated that the plaintiffs, in failing to plead it, had waived any potential statute of limitations defense. The referee addressed the statute of limitations issue in finding that the continuing course of conduct doctrine tolled the thirty day filing period prescribed by § 4-61dd.

In their appeal to the Superior Court, the plaintiffs did not allege that Saeedi's claims were time barred, but that the thirty day filing period divested the office of public hearings of jurisdiction over Saeedi's claims. In their trial brief to the court, the plaintiffs argued that the filing period rendered the office of public hearings without "jurisdiction over [Saeedi's] untimely allegations." Saeedi, in his trial brief to the court, again argued that the "plaintiffs' statute of limitations defense . . . [had] been waived." The court, in adopting the referee's reasoning, found that the filing period in § 4-61dd is not a jurisdictional limitation, and is, therefore subject to tolling under the continuing course of conduct doctrine.

"The interpretation of the requirements of the rules of practice presents a question of law, over which our review is plenary." *Cue Associates, LLC* v. *Cast Iron Associates, LLC*, 111 Conn. App. 107, 111, 958 A.2d 772 (2008). "Practice Book § 10-50 provides that [f]acts which are consistent with [the claimant's allegations] but show, notwithstanding, that the plaintiff has no cause of action, must be specially alleged. Thus . . .

---

[13] The plaintiffs, in contending that § 4-61dd contains a mandatory statute of limitations, conflated that issue with the issue of jurisdiction, claiming that the thirty day filing period is "not just procedural, but is 'a substantive and jurisdictional prerequisite' to bringing the action."

the statute of limitations . . . must be specially pleaded . . . . The fundamental purpose of a special defense, like other pleadings, is to apprise the court and opposing counsel of the issues to be tried, so that basic issues are not concealed until the trial is underway." (Internal quotation marks omitted.) *Martino* v. *Scalzo*, 113 Conn. App. 240, 245, 966 A.2d 339, cert. denied, 293 Conn. 904, 976 A.2d 705 (2009). It follows, therefore, that "[w]here a particular statute of limitations . . . is not jurisdictional and has not been pleaded, [the opposing party] is entitled to conclude that it was waived." (Emphasis omitted; internal quotation marks omitted.) Id., 247.

Here, not only did the plaintiffs fail to allege any statute of limitations defense before the hearing began, but they did not claim any such defense until after the hearing had concluded, when they first raised the argument in their trial brief. Not only does their strategy fail to comport with the rules of practice, it fails to comport with a fundamental principle underlying those rules: the parties and the tribunal, as they embark on the trial process, are entitled to know definitively the scope of the legal and factual issues to be addressed during that trial. The plaintiffs are not entitled to raise this defense only after the conclusion of the hearing before the referee, decline to raise the issue on appeal to the Superior Court, and then raise it now before this court.[14] See *Dockter* v. *Slowik*, 91 Conn. App. 448, 462,

---

[14] The plaintiffs, in their reply brief to this court, contend that this issue was "raised and decided by [the referee] and by the trial court." This contention, however, misapprehends the matter. While the plaintiffs technically are correct in claiming that the statute of limitations defense was raised, what they overlook is that, bearing the burden of raising the defense in the first instance, they did not *timely* or *properly* raise it. And while the plaintiffs are, again, technically correct in asserting that the referee and the court addressed the issue of the statute of limitations, the record reflects an attempt by the referee and the court to address the plaintiffs' ever shapeshifting arguments on this point, and their jurisdictional questions, rather than a decision on a properly raised special defense.

881 A.2d 479 ("[o]ur rules of procedure do not allow a [party] to pursue one course of action . . . and later, on appeal, argue that a path he rejected should now be open to him" [internal quotation marks omitted]), cert. denied, 276 Conn. 919, 888 A.2d 87 (2005). We, accordingly, deem the plaintiffs' claim waived and decline to address its merits.

## II

## ELECTION OF REMEDIES

The plaintiffs next contend that three of Saeedi's claims were "invalidated" because he elected an alternate exclusive remedy for his claims when his union filed grievances for the challenged personnel actions. As the plaintiffs are raising this claim for the first time on appeal, we decline to review its merits.

In their motion to dismiss filed with the referee on May 19, 2010, more than one and one-half years after Saeedi filed his complaint alleging retaliation for whistle-blowing, the plaintiffs set forth, for the first time, the argument that Saeedi's union, having filed grievances on his behalf to challenge the plaintiffs' adverse personnel actions, rendered the office of public hearings without jurisdiction to hear his claims because he had elected his exclusive remedy of pursuing his claims via the grievance process under the union's collective bargaining agreement. The defendants objected to the motion, and the referee, after hearing argument, denied it, issuing a short order from the bench. The plaintiffs again raised this argument, rooted in the alleged lack of jurisdiction of the referee, to the trial court on appeal, and the court found that the referee did not err in determining that the filing of grievances did not deprive the referee of jurisdiction to hear Saeedi's claims.

On appeal to this court, the plaintiffs now present the argument that Saeedi's union's use of the grievance

process served to "invalidate" Saeedi's claims because he chose to pursue them through the forum provided by the collective bargaining agreement.[15] The plaintiffs no longer claim that this deprives the referee of jurisdiction to decide the matter. They claim that Saeedi's claims "should have been dismissed" because § 4-61dd requires the employee to elect an exclusive forum in which to pursue these claims, and Saeedi elected his exclusive forum when his union filed its grievances.[16]

"This court has said many times that it will not review a claim that is not distinctly raised at trial. . . . A claim is distinctly raised if it is so stated as to bring to the attention of the court the *precise* matter on which its decision is being asked." (Citation omitted; emphasis added; internal quotation marks omitted.) *Dockter* v. *Slowik*, supra, 91 Conn. App. 462. "Our rules of procedure do not allow a [party] to pursue one course of action . . . and later, on appeal, argue that a path he rejected should now be open to him. . . . To rule otherwise would permit trial by ambuscade." (Internal quotation marks omitted.) Id.

---

[15] We note that the referee found that Saeedi's collective bargaining agreement did not provide for a vehicle to grieve whistle-blower retaliation claims.

[16] The plaintiffs' abandonment of their jurisdictional argument is unsurprising considering our Supreme Court's holding in *Grant* v. *Bassman*, 221 Conn. 465, 604 A.2d 814 (1992). In *Grant*, the Supreme Court addressed the question of "whether a claim that an injured plaintiff has elected workers' compensation as his exclusive remedy deprives the Superior Court of subject matter jurisdiction . . . ." Id., 471. The court, adopting the reasoning of *Fusaro* v. *Chase Brass & Copper Co.*, 21 Conn. Supp. 240, 154 A.2d 138 (1956), determined that "[t]he confusion [about whether electing an exclusive remedy divests a tribunal of subject matter jurisdiction] arises from the fact that the compensation procedure . . . involves a special tribunal, rather than the Superior Court"; nonetheless, electing the remedy of workers' compensation does not result in "a lack of jurisdiction in the court but a want of a cause of action in the plaintiff." (Emphasis omitted; internal quotation marks omitted.) *Grant* v. *Bassman*, supra, 472. Accordingly, the court explained, the claim that a plaintiff has made an exclusive election of remedies "is properly raised by a special defense," rather than as a challenge to the jurisdiction of the court. Id.

The plaintiffs now attempt to reincarnate a claim they originally characterized as jurisdictional so that they may advance a different legal theory in support of their position at the appellate stage of the proceedings. We are not inclined to entertain such a strategy, and decline to do so. We, therefore, do not address this claim's merits.

## III

### ORDER FOR ETHICS TRAINING AND REVISION OF PERFORMANCE APPRAISAL

The plaintiffs' final claim is that the referee exceeded the authority conferred upon him by § 4-61dd in fashioning an award that included ordering the plaintiffs to undergo ethics training and to revise Saeedi's performance appraisal to include a particular score in the area of "judgment." They contend that § 4-61dd does not authorize the referee to make such an order.

In devising his final decision to remedy the effects of the plaintiffs' impermissible retaliation, the referee ordered, inter alia, that the plaintiffs (1) "shall issue [Saeedi] a revised performance appraisal for the September, 2007 to September, 2008 period omitting references to the five day and ten day suspensions, retaining the same scores as in [the September, 2008 appraisal] except for the category of 'judgment,' increasing the scores in the 'judgment' competencies and the 'judgment' category to a score of '[four]'; and giving [Saeedi] an overall performance rating of 4.375 (excellent)," and (2) "shall within nine months of this decision receive training [in professional ethics] at [the department's] expense . . . ." The trial court found that these specific components of the order fell within the referee's authority under § 4-61dd in light of the remedial purpose of the statute and the factual findings made in this case. The plaintiffs contend that the trial court erred in determining that these facets of the referee's order fall

within the ambit of the authority granted to the referee by § 4-61dd. We agree with the plaintiffs only with respect to the referee's ordering of professional ethics training.

"Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and . . . provide[s] a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . [I]t is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . . [A]s to questions of law, [t]he court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts." (Internal quotation marks omitted.) *Eagen* v. *Commission on Human Rights & Opportunities*, 135 Conn. App. 563, 572–73, 42 A.3d 478 (2012).

Determining whether the referee applied the law correctly to the facts of this case requires us to interpret the meaning of § 4-61dd. "The process of statutory interpretation involves the determination of the meaning of

the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . . In seeking to determine [the] meaning [of a statute], General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *Stec* v. *Raymark Industries, Inc.*, 299 Conn. 346, 358, 10 A.3d 1 (2010).

We, accordingly, look first to the relevant language of § 4-61dd. Section 4-61dd (b) (3) (A) provides in relevant part that "[i]f the human rights referee finds . . . a violation, the referee may award the aggrieved employee reinstatement to the employee's former position, back pay and reestablishment of any employee benefits for which the employee would otherwise have been eligible if such violation had not occurred, reasonable attorneys' fees, and any other damages. . . ." The term "any other damages" reasonably is subject to both broad and narrow interpretations. As the defendants propose, the term "any damages" may refer to any relief the referee deems appropriate under the factual circumstances of the case and in light of the remedial nature of the statute. "Any damages" may also mean only compensation for economic harm, as the plaintiffs suggest.

Given that this language lends itself to more than one reasonable interpretation, we conclude that § 4-61dd is ambiguous with respect to the authority it grants the referee to fashion remedies.

Having determined that § 4-61dd is ambiguous, we turn to extrinsic sources to discern its meaning, beginning with its legislative history. See *Hatt* v. *Burlington Coat Factory*, 263 Conn. 279, 308, 819 A.2d 260 (2003) ("[s]tatements of legislators often provide strong indication of legislative intent" [internal quotation marks omitted]). The legislature introduced and ultimately passed the initial version of § 4-61dd as House Bill No. 5421, "An Act Concerning Whistle Blowing by State Employees." During floor debates, Representative Patricia T. Hendel, addressing the House of Representatives, explained that "employees should not be afraid to point out waste and corruption when and if they see such things in our [s]tate's government." 22 H.R. Proc., Pt. 24, 1979 Sess., p. 8457. In support of the bill, Representative Richard J. Balducci echoed this sentiment in stating that the bill "allow[s] [a] [s]tate employee, without fear of retaliation or repercussions for his or her doing so, to report information . . . to the [a]ttorney [g]eneral's office." Id., p. 8461. This discussion reveals the overarching remedial purpose of § 4-61dd and its aim to protect whistle-blowing state employees from retribution or reprisal.

Our Supreme Court has long held that remedial statutes are to be interpreted broadly to effectuate their purpose. See, e.g., *Pizzuto* v. *Commissioner of Mental Retardation*, 283 Conn. 257, 265, 927 A.2d 811 (2007) ("act indisputably is a remedial statute that should be construed generously to accomplish its purpose" [internal quotation marks omitted]); *Dysart Corp.* v. *Seaboard Surety Co.*, 240 Conn. 10, 18, 688 A.2d 306 (1997) ("remedial statutes should be construed liberally in favor of those whom the law is intended to protect").

Here, however, the legislative history of the 2002 amendment of § 4-61dd, House Bill No. 5487, reveals an intent to allow referees to award a limited array of remedies in cases of whistle-blower retaliation. The 2002 amendment added, as an alternative route of adjudication for whistle-blowers, the administrative process initiated through the commission, designated the referee as an independent hearing officer and set forth the remedies the referee is authorized to award. The language of the bill as related to remedies, however, was revised before passage to "narrow [its] scope . . . ." 45 H.R. Proc., supra, p. 2863, remarks of Representative William A. Hamzy. As explained by Representative O'Rourke, the language ultimately adopted "narrow[s] it by removing maintenance of the employee's current position, rehiring [and] reinstatement of the employee and replaces that with reinstatement to the employee's former position, back pay and reestablishment of any employee benefits." Id. These comments indicate that the legislature intended to cabin the variety of remedies a referee is empowered to award, particularly with respect to the equitable relief available under § 4-61dd.

In discussing, specifically, the term "any other damages," Representative Robert W. Heagney asked Representative O'Rourke, a proponent of the amendment, "Is there any limitation on the word damages here?" Id., p. 2938. In response, Representative O'Rourke stated that "it means actual damages and that would be limiting." Id., p. 2939. To clarify the point, Representative Heagney asked, "[W]hen used [in this bill] any other damages [its] . . . legislative intent is to limit that to actually incurred damages and not to some number that the trial referee might determine he thought appropriate without a basis?" Id. Representative O'Rourke confirmed that this was an accurate characterization of the intent behind the term, "any other damages." Id. What this discussion makes clear is that the legislature

intended "any other damages" to encompass compensation for economic harm, or as Representative Christopher R. Stone put it, those damages that would "make the employee whole." Id., p. 2917.

We look next to the legislation that governs other types of workplace discrimination subject to the jurisdiction of the commission. General Statutes § 46a-86 (a) (formerly § 46a-82) requires the commission, "when it has found an unfair employment practice, to take such affirmative action, including, but not limited to, hiring or reinstatement of employees, with or without back pay, or restoration to membership in any respondent labor organization, as in the judgment of the tribunal will effectuate the purposes of this chapter." (Internal quotation marks omitted.) *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, 232 Conn. 91, 102, 653 A.2d 782 (1995). The language of § 46a-86 (a) evinces an intent by the legislature to impart broad powers to the commission to take "affirmative action" not limited to those listed in the statute.[17] Neither the language of § 4-61dd or its legislative history evinces such an intent. Looking at these two pieces of legislation together, we conclude that where the legislature intends to grant broad remedial powers to the commission, there is a clear indication of such intent.

In light of the apparent legislative intent to limit the scope of the remedies the referee may award pursuant

---

[17] Even under the much broader language of § 46a-82, which authorizes the referee to take "affirmative action," our Supreme Court has recognized that "[t]his language does not confer on the [commission] the power to impose exemplary or punitive damages on a discriminating employer, nor even to compensate the employee for any consequential or incidental damages he or she may have suffered by reason of the employer's discriminatory conduct. Instead, it directs the [commission] to ensure that whatever remedy is fashioned for the employee be designed to return him or her to the same economic status he or she would have had in the workplace if unlawful discrimination never occurred." (Internal quotation marks omitted.) *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, supra, 232 Conn. 111.

to § 4-61dd, the term "any other damages" does not encompass equitable forms of relief, but is confined to compensating victims of whistle-blower retaliation for the economic harm they suffer. We, therefore, conclude that the trial court erred in finding that the referee correctly applied the law when ordering the plaintiffs to take a professional ethics class because this remedy is not within the ambit of compensation for economic harm.

With respect to the component of the referee's decision that ordered the plaintiffs to revise Saeedi's September, 2008 performance appraisal to reflect a score of "four" in the area of judgment, and an overall score of "excellent," we conclude that this remedy is authorized by the text of § 4-61dd that provides for "reinstatement to the employee's former position . . . ." General Statutes (Rev. to 2007) § 4-61dd (b) (3) (A). The referee, in order meaningfully to implement the remedy of reinstating Saeedi to his former position, properly could order that the performance appraisal be revised to eliminate the retaliatory animus. Not only did this effectuate the purpose of the statute, but it was the only way fully to return Saeedi to his former position. Before the plaintiffs retaliated against Saeedi, he held the position of a physician with a history of sterling performance appraisals and no disciplinary record whatsoever. After the plaintiffs' retaliation, Saeedi had a substantial record of discipline and an unsatisfactory performance appraisal, which put him in peril of being dismissed if he were to receive an additional unsatisfactory appraisal. Reinstating Saeedi to the untarnished position he held prior to the retaliation, as plainly authorized by § 4-61dd, required that the referee order a revision of Saeedi's performance appraisal. We, therefore, conclude that the trial court did not err in finding that the

referee properly ordered a revision of Saeedi's performance appraisal to reflect specific scores.[18] While we conclude that the trial court correctly found that the referee was acting within the scope of the authority conferred on him by § 4-61dd, we do not opine on whether the referee reasonably and logically could have concluded, based on the evidence before him, that the particular score he ordered was appropriate, as this question was not raised by the parties.

The judgment is reversed only as to the order for professional ethics training and the case is remanded with direction to vacate that order. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

---

[18] The plaintiffs argue that the referee had the authority to order them to conduct a new appraisal of Saeedi, but lacked the authority to order particular scores on that appraisal. We disagree with that framing of the issue. Whether the referee properly ordered that the plaintiffs issue a particular score on the appraisal is a question to be resolved by the factual record. The propriety of the referee's having ordered that specific scores be awarded for Saeedi's performance depends on whether the referee had an adequate evidentiary basis for concluding that the specific scores would have been awarded absent the plaintiffs' retaliatory animus.